UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| ARTHREX, INC. and<br>ARTHREX MANUFACTURING, INC.,<br><br>    Plaintiffs/Counter-defendants,<br><br>v.<br><br>PARCUS MEDICAL, LLC,<br><br>    Defendant/Counterclaimant. | )<br>)<br>)<br>)<br>) CAUSE NO. 1:11-mc-00107-SEB-DML<br>)<br>) Underlying case: Middle District of Florida<br>) (Case No. 2:10-civ-151-FtM-CEH-DNF)<br>)<br>) |

## Order on Motion to Compel

This matter is before the court on the motion (Dkt. 1) by Arthrex, Inc. and Arthrex Manufacturing, Inc. (together, "Arthrex") to compel non-party Scott Durlacher to produce documents in response to a subpoena issued by Arthrex out of this court for use in a case pending in the Middle District of Florida, *Arthrex, Inc. et al. v. Parcus Medical, LLC,* 2:10-CIV-151-FtM-36-DNF.  Mr. Durlacher and defendant Parcus jointly oppose the motion, request that the court quash the subpoena or, in the alternative, issue a protective order modifying the subpoena. In addition, Mr. Durlacher requests that if the court does not quash the subpoena, that it order Arthrex to pay him for his time and other costs in complying with the subpoena.

### Factual Background

#### The Underlying Litigation

The underlying litigation is a suit between competitors.  Plaintiff Arthrex makes and sells surgical devices used in orthopedic surgery, particularly surgery to the shoulder, knee, and other joints.  Arthrex's suit against Parcus Medical, LLC, filed in March 2010, alleges that Parcus misappropriated Arthrex's trade secrets, tortiously interfered with Arthrex's contracts and

business relationships, and committed other unfair trade practices. (*See* Arthrex Memorandum in Support of Motion to Compel ("Arthrex Memo"), Dkt. 1, at p. 2.).

Parcus was formed in April 2007 and began business operations in January 2008. It was founded by seven persons, three of whom had been employed by Arthrex years before Parcus's formation. Parcus was formed after any non-competition agreements applicable to the former Arthrex employees had expired. (*See* Parcus/Durlacher opposition memorandum ("Parcus Memo"), Dkt. 13, at pp. 3-4). According to Arthrex, Parcus was able quickly upon its formation to introduce to the market surgical devices like those made and sold by Arthrex, and began targeting for sales the same customers and distributors that had purchased Arthrex's goods. It believes that Parcus misappropriated Arthrex's trade secrets to achieve its success in the marketplace, and Arthrex's documents subpoena to Mr. Durlacher seeks discovery to support that belief.

Mr. Durlacher is not one of Parcus's founders or an officer or employee of Parcus. (Parcus Memo at 3). Rather, he is a consultant to Parcus, and was an executive at Arthrex, serving as its Director of Regulatory Affairs and Quality Assurance. (Durlacher Affidavit, ¶ 2, Dkt. 13-9; Arthrex Memo at 3). Mr. Durlacher last worked for Arthrex in 1998 (*see* Dkt. 14-1), but the record does not indicate when he first was engaged by Parcus. Arthrex states that Mr. Durlacher's consulting services for Parcus are as a "regulatory/quality engineer" (Arthrex Memo at 3), and thus, he provides services to Parcus similar to those he performed as an Arthrex employee. In the underlying litigation, Parcus has pointed to Mr. Durlacher's work in developing and designing Parcus's manufacturing systems and in obtaining regulatory approvals for Parcus's products to show that Parcus developed its own FDA-compliant systems, thereby

rebutting allegations that Parcus misappropriated Arthrex's information to do so.  (Arthrex Reply, Dkt. 14, at p. 1 and Dkt. 14-1).

### The Subpoena to Mr. Durlacher

Arthrex served its documents subpoena on Mr. Durlacher in late May 2011.  Arthrex and Mr. Durlacher's counsel (who is also counsel to Parcus) had numerous discussions over the ensuing months, both before and after Arthrex filed its motion to compel, to try to bridge their differences regarding the scope of documents requested by Arthrex and to reimburse Mr. Durlacher for his time in gathering and producing documents.  The discussions did not bridge the divide, and these issues have been presented to this court for decision.

Although Arthrex's subpoena (Dkt. 2-1) seeks from Mr. Durlacher all documents he has related to either Arthrex or Parcus and documents related to his involvement with Parcus, Arthrex's motion to compel drops three of its nine original requests, and Arthrex later offered other limits to the subpoena.  (*See* Dkt. 13-1).   Arthrex's reply brief agrees that it recently limited the scope of the categories of documents it seeks.  (Dkt. 14 at p.4).  The court will assume that these limits apply, and they are printed in italics below.

Arthrex seeks an order requiring the production of:

Request No. 2  - All documents and /or communications related to Arthrex's manufacturing techniques, customer information, cost information, pricing information, volume information, profit information, marketing strategies, marketing information, sales information and/or distributor information.

*Request 2 is limited to documents and/or communications regarding Arthrex suture anchor and interference screw products (including ancillary products).*

Request No. 3 – All documents and/or communications related to Parcus Medical LLC manufacturing techniques, customer information, cost information, pricing information, volume information, profit information, marketing strategies, marketing information, sales information and/or distributor information.

*Request 3 is limited to documents and/or communications related to Parcus' PEEK and Titanium Interference Screws (including ancillary products), PEEK and Titanium V-LoX Suture Anchors (including ancillary products), Drop Tip Guide Pins, Ratcheting Handle, Braid Suture, Graft Station, Hybrid Suture Anchors (including ancillary products), and Series 3 Suture Anchors (including ancillary products).*

Request No. 4 - Any employment contracts, communications or other agreements between Scott Durlacher, the Anson Group, Creo Quality, LLC, and/or Eos Research, LLC and Parcus Medical LLC, whether expired or currently enforceable.[1]

Request No. 5 – All documents and/or communications related to development, creation, implementation, maintenance, and/or updating of Parcus Medical LLC procedures and/or systems, including but not limited to drafts, revisions, templates, resources, and currently used procedures and/or systems, regarding:
   a) Parcus Quality Systems
   b) Parcus Regulatory Affairs
   c) Parcus Product Design Control
   d) Parcus Product Development
   e) Parcus Manufacturing Techniques and/or Procedures
   f) Parcus Sterilization/Cleaning Validations
   g) Parcus Master Validation Plans
   h) Parcus Quality Design
   i) Parcus Design History Files
   j) Parcus Manufacturing Equipment

*Request 5 is limited to documents and/or communications related to Parcus' PEEK and Titanium Interference Screws (including ancillary products), PEEK and Titanium V-LoX Suture Anchors (including ancillary products), Drop Tip Guide Pins, Ratcheting Handle, Braid Suture, Graft Station, Hybrid Suture Anchors (including ancillary products), and Series 3 Suture Anchors (including ancillary products).*

Request No. 6 – All documents and/or communications related to any comparison of any Parcus Medical LLC product, process, and/or manufacturing technique with any Arthrex product, process, and/or manufacturing technique.

*Request 6 is limited to documents and/or communications related to any comparison of Parcus' PEEK and Titanium Interference Screws (including ancillary products), PEEK and Titanium V-LoX Suture Anchors (including ancillary products), Drop Tip Guide Pins, Ratcheting Handle, Braid Suture, Graft Station, Hybrid Suture Anchors (including ancillary products), and Series 3 Suture Anchors (including ancillary products) with any Arthrex product and/or manufacturing technique.*

---

[1] The Anson Group, Creo Quality, and Eos Research are entities with which Mr. Durlacher is, or has been, associated. *See* Arthrex Memo at 7. Thus, request 4 seeks contracts between Parcus and Mr. Durlacher or these Durlacher-related entities. *See* Dkt. 13-1.

4

Request No. 7 – All documents and/or communications regarding the events leading to your involvement with Parcus Medical LLC.

*Request 7 is limited to documents and/or communications dated from 2006 to the present.*

## Analysis

**I.      Documents sought by a Rule 45 subpoena must be relevant, and the subject requests satisfy that standard.**

The scope of discovery available by way of a Rule 45 subpoena generally is measured by the same broad relevancy standard applicable to party discovery under Rule 26(b)(1).  *See, e.g., Jackson v. Brinker,* 147 F.R.D. 189, 193-94 (S.D. Ind. 1993) (internal citations omitted) ("The scope of material obtainable by a Rule 45 subpoena is as broad as permitted under the discovery rules . . . if material is relevant, not privileged, and is, or is likely to lead to, admissible evidence, it is obtainable by way of subpoena"); Advisory Committee Notes regarding 1991 amendments to Rule 45 ("non-party witness is subject to the same scope of discovery under this rule as that person would be as a party to whom a request is addressed pursuant to Rule 34"); Alan Wright et al., 9A *Federal Practice & Procedure* § 2459 n.12  (relevancy standard permitting discovery of any nonprivileged matter relevant to a party's claim or defense "has been applied to subpoenas in many cases") .

But even if the documents a party wishes to subpoena are relevant, Rule 45 constrains what a party can demand from non-parties.  For instance, it imposes a duty on the party or lawyer issuing a subpoena to "avoid imposing undue burden or expense on a person subject to" the subpoena.  Rule 45(c)(1).  The court must enforce this duty and may do so by quashing the subpoena or awarding monetary sanctions, or both.  *Id.*; *Mattel, Inc. v Walking Mountain Productions*, 353 F.3d 792, 814 (9th Cir. 2003).

As the Florida district court observed in a December 2010 discovery order (*see* Dkt. 13-2), this case alleges a factual scenario not uncommon in litigation. Former employees of a company started a business competitive to their former employer. The former employer (Arthrex) alleges that its old employees, through their new company (Parcus), are unfairly competing at least in part by using in their new business trade secrets and confidential information they misappropriated from the old employer.

The documents requested by Arthrex from Mr. Durlacher are relevant, in the broad discovery sense, to Arthrex's legal theories. Logically, the information it seeks could lead to admissible evidence on whether information Arthrex claims as trade secrets (like manufacturing techniques, marketing and sales information, and pricing information) was or is used by Parcus in the development of its products and its general business operations. Categories 2, 3, 5, and 6 of the subpoena go directly to these issues by seeking Arthrex documents and Parcus documents relating to manufacturing techniques, marketing and sales information, and pricing-related information, and any documents comparing Arthrex and Parcus products or their manufacturing processes or techniques. Categories 4 and 7, which seek to discover the facts underlying Mr. Durlacher's involvement with Parcus and the contracts governing their relationship, are designed to determine whether Parcus hired Mr. Durlacher because of his familiarity with Arthrex's trade secrets.

Parcus contends, however, that the Florida district court's December 2010 order (Dkt. 13-2) establishes the outer limits of information relevant to the litigation. That order granted Arthrex's motion to compel Parcus to respond to document requests and interrogatories. Parcus had resisted any discovery on the ground that Arthrex had yet to identify sufficiently the trade secrets at issue in the case, arguing that it was not appropriate to allow Arthrex to use discovery

to burrow into Parcus's records in an attempt to find some basis for Arthrex's trade secret allegations. The court found that Arthrex had sufficiently described the trade secrets and ordered Parcus to comply with the discovery requests. Among the court's findings were that Arthrex had identified its "interference screw and threaded suture anchors" as products "knocked-off" by Parcus, and that Arthrex had defined the Parcus products as the PEEK and Titanium Interference Screws, PEEK and Titanium V-LoXSuture Anchors, Drop Tip Guide Pins, Ratcheting Handle, Braid Suture, and Graft Station. (*See* Dkt. 13-2 at p. 3).

Parcus asserts that the December 2010 order thus established that the Florida litigation is limited for all purposes, including discovery, to these eight Parcus surgical products. This court does not read that order, however, to establish a relevance boundary that limits discovery to these eight products. Without a clear expression of intent by the Florida district court not to permit Arthrex discovery with respect to Parcus products other than those Arthrex identified in its September 2010 discovery responses, this court finds no reason for abandoning the usual relevance standard. Further, Arthrex's subpoena—as limited by Arthrex in its October 7, 2011 correspondence (Dkt. 13-1)—is directed to only two products other than the eight products originally identified. The two other products are Parcus's Hybrid Suture Anchors and Series 3 Suture Anchors. According to Arthrex, these products did not exist when Arthrex served its initial September 2010 discovery responses. Moreover, they are Parcus suture anchors, and Arthrex explained in its September 2010 discovery responses that its case is focused on interference with its trade secrets relating to screws and suture anchors.[2]

---

[2] Had Arthrex not limited the subpoena to the eight Parcus products discussed in the December 2010 order and the two new suture anchors, the court would have concerns that Arthrex was using the subpoena to Mr. Durlacher improperly to expand the matters understood by the parties to be at issue in the Florida case. For example, Arthrex's opening and reply briefs stress relevance principles (defining the scope of discovery to include any matter that could bear

The court concludes that Arthrex's subpoena (as limited) seeks relevant information and is thus not unduly burdensome solely because it requests irrelevant information, as Parcus and Mr. Durlacher argue. *See Builders Ass'n of Greater Chicago v. City of Chicago,* 215 F.R.D. 550, 554 (N.D. Ill. 2003) ("A subpoena is obviously unduly burdensome if the information is wholly irrelevant under any reasonable legal theory.")

## II.   The court is empowered to modify, quash, or impose conditions to compliance when a subpoena imposes an undue burden or significant expense.

As noted above, relevant information is not *always* discoverable but is balanced with other factors recognized by Fed. R. Civ. P. 26. That is as true for discovery directed to parties under Rule 34 as it is for non-party documents discovery under Rule 45. But with non-party discovery under Rule 45, the court must be especially vigilant to protect the non-party from undue burden and expense. That theme purposefully runs throughout Rule 45(c) (*see* the Advisory Committee Notes to the 1991 amendments to Rule 45), and the court has broad powers to quash or modify a subpoena, order the payment of attorneys' fees, or order the issuing party to subsidize in whole or in part the costs a subpoenaed party may incur to comply with the subpoena. Subsection (c)(1) imposes on the court the obligation to police the issuing party's duty to not impose an undue burden; subsection (c)(2) permits the court, in ruling on a motion to

---

on any issue that is or may be in the case) that were reined in through amendments to Rule 26 in 2000. For example, discovery on "any matter relevant to the subject matter" of a case (as opposed to matters relevant to claims or defenses), requires a demonstration of good cause. *See* Rule 26(b)(1) and the Advisory Committee Notes regarding the 2000 amendments. This court's opinion in *Sanyo Laser Products, Inc. v. Arista Records, Inc.,* 214 F.R.D. 496 (S.D. Ind. 2003), includes a discussion of the 2000 changes to Rule 26, notes that the changes to Rule 26 were not intended to change the relevance standard but were designed to focus courts on whether discovery, though relevant, is otherwise unduly burdensome when measured against its importance to the case and when there is a better way to get the information. *See also Patterson v. Avery Dennison Corp.,* 281 F.3d 676, 681 (7th Cir. 2002) (internal quotations omitted) (although strong public policy favors disclosure of relevant materials, court should weigh "the value of the material sought against the burden of providing it and taking into account society's interest in furthering the truthseeking function in the particular case before the court").

compel when objections to production were made, to order production under terms it deems appropriate that will "protect a person who is neither a party nor a party's officer from significant expense resulting from compliance"; subsection (c)(3) allows the court, on motion, to modify or quash a subpoena to prevent an undue burden.

The court rejects Arthrex's argument that the court may modify or quash a subpoena only when the subpoenaed party moves to quash or modify the subpoena, or moves for a protective order, before the time set forth in the subpoena for compliance. The court's independent duty to police discovery and to set the terms for compliance when a subpoenaed party timely objects[3] are sufficient sources of the court's power to take appropriate measures to protect a non-party from undue burden, including the power to modify the subpoena or quash it outright. A party's lack of diligence in seeking relief may factor into the analysis, however.

In this case, each side accuses the other of a lack of diligence. Parcus says that Arthrex waited until the last possible moment to bring its motion to compel, months after Mr. Durlacher had made his objections. Arthrex says that Mr. Durlacher and Parcus should have moved for a protective order, or moved to quash or modify the subpoena promptly upon its issuance. This court will not take either party to task, nor will it apply waiver principles under these circumstances. The record reveals that Arthrex's counsel and Mr. Darlacher's counsel (who is also Parcus's counsel) engaged in numerous discussions—by letter, email, and telephone—to try to resolve their differences regarding the scope of the subpoena and what burden could

---

[3] The court finds that Mr. Durlacher, through counsel, acted with sufficient promptness to lodge his written objections to the subpoena. Arthrex had difficulties effecting service on Mr. Durlacher (who apparently did not receive the subpoena, though dated May 24, until the evening of June 5). His counsel contacted Arthrex on June 15 about his objections and made formal written objections on June 20. (*See* Dkt. 2-2).

9

reasonably be imposed on Mr. Durlacher. Those efforts continued after Arthrex filed its motion to compel and had the salutary effect of further limiting the subpoena.

The court also notes that the discussions between counsel eliminated some other potential burdens. The parties have agreed that any documents produced under the subpoena will be governed by the terms of a stipulated protective order in the underlying litigation. And even though the original subpoena set a date for compliance only two days after actual service on Mr. Durlacher, Arthrex stated at the outset its recognition that Mr. Durlacher must have a reasonable period of time to search for, gather, and make documents available.

The court will now address and resolve the parties' contentions that, even as limited, the subpoena imposes an undue burden or significant expense on Mr. Durlacher.

**A.  Overbreadth**

Parcus and Mr. Durlacher argue that the sheer breadth of the information sought by Arthrex makes compliance an undue burden. Although the court has found that the subpoena seeks relevant documents, the court agrees that given the nature of Mr. Durlacher's consulting services for Parcus (having assisted, or taken a primary role in, developing and designing Parcus's manufacturing systems and obtaining regulatory approvals of Parcus's products), the number of documents covered by the subpoena (as limited) may be enormous. The court's concern with overbreadth is heightened by the fact that many of the documents sought from Mr. Durlacher, particularly those involving Parcus's manufacturing techniques, marketing and sales information, and cost-related information (Request No. 3), and Parcus's creation and implementation of designs and quality control mechanisms (Request No. 5) could have and should have been obtained from Parcus itself. A party's ability to obtain documents from a source with which it is litigating is a good reason to forbid it from burdening a non-party with

production of those same documents. *See Morrow v. Air Ride Technologies, Inc.,* 2006 WL 559288 at *2 (S.D. Ind. March 6, 2006) (requiring party to show that it could not obtain documents from its adversary before permitting the party to burden a non-party to produce the same documents); Rule 26(b)(2) (court may limit discovery where it is unreasonably cumulative or duplicative, or can be obtained from another source with less burden or expense).

Arthrex explains that although some requests overlap with requests it made to Parcus, it is justified seeking the same documents from Mr. Durlacher. First, Arthrex has obtained from other non-parties Parcus documents that Parcus apparently did not keep or maintain, which may be attributable to "computer and server problems" that Parcus has had that "ha[ve] affected its ability to produce documents, including pre-2008 documents." (Arthrex Reply, Dkt. 14, at p. 3). Thus, asking Mr. Durlacher to produce documents that Parcus may also have ensures that Arthrex obtains as full a production as possible in the litigation as a whole. Second, Arthrex points to Mr. Durlacher's apparently critical role in assisting in the development of Parcus's manufacturing, quality control, and FDA-compliant processes and procedures, which Parcus has asserted tends to show that Parcus did not misappropriate any Arthrex trade secrets or otherwise unfairly trade on Arthrex confidential information. The mere fact that Mr. Durlacher himself possesses certain documents may be important to evaluating the scope of Mr. Durlacher's role and Parcus's defense theory.

The need for discovery of Mr. Durlacher's role and Parcus's alleged use of Arthrex information, through the contents of documents Mr. Durlacher possesses or controls—regardless of whether Parcus also possesses them—convinces the court that the subpoena does not overreach in scope as to Request 2 (Arthrex documents within Mr. Durlacher's possession or control), Request 6 (documents comparing Arthrex and Parcus products, processes, and

techniques that Mr. Durlacher possesses or controls), Request 4 (Mr. Durlacher's (or his companies') contracts with Parcus), and Request 7 (communications and documents "regarding the events leading up to" Mr. Durlacher's involvement with Parcus). *See, e.g., Behrend v. Comcast Corp.,* 248 F.R.D. 84, 86 (D. Mass 2008) (to determine whether subpoena imposes undue burden, court should consider the relevance and importance of the documents sought, breadth of documents sought, and expense and inconvenience of their production from non-party); *Morrow,* 2006 WL 559288 at *2 (S.D. Ind. Mar. 6, 2006) (same) (citing *Goodyear Tire & Rubber Co. v. Kirk's Tire & Auto Servicenter of Haverstraw, Inc.,* 211 F.R.D. 658, 662-63 (D. Kan. 2003)).

For Request 5 (documents related to Parcus's procedures and systems that Parcus may have itself), Arthrex's reasons for seeking them from Mr. Durlacher have less force, but the court is persuaded that given Mr. Durlacher's regulatory and quality engineering expertise, he may be even a better source than Parcus with respect to "drafts, revisions, templates" and the like regarding the matters addressed in Request 5.

For Request 3 (documents related to Parcus's manufacturing techniques, marketing-type information, and cost-type information that Parcus almost surely possesses), the court has the least confidence in the necessity of seeking these documents from Mr. Durlacher. Depending on the stakes in a case, parties may desire to eliminate the possibility of missing a single piece of paper by requesting the same relevant documents from every source that may have them, but that is not a sufficient reason to burden non-parties. But instead of denying the discovery of the documents from Mr. Durlacher outlined in Request 3 (particularly because the subject matter may overlap with documents in the other requests), the court will ameliorate the burden on Mr. Durlacher through other means, as explained below.

### B. Time and expense to comply

Mr. Durlacher has submitted an affidavit stating his estimate that searching for, reviewing, and producing the requested documents (even as limited and addressed in this entry) "will take approximately 60 hours." He also states that he currently averages 50-60 billable hours per week and charges his clients $165 per billed hour. Mr. Durlacher wants to be reimbursed at $165 per hour for every hour he spends complying with the subpoena on the ground that each of those hours is an hour he otherwise could bill. Finally, Mr. Durlacher says that he would need at least four weeks to comply so as not to affect adversely work he needs to do for other clients (which suggests that he can comply with the subpoena without interfering with his client work if the work is spread out). (*See* Dkt. 13-9).

Arthrex is "not unwilling to bear adequate costs to avoid imposing undue burden and expense" on Mr. Durlacher, but argues that the demand for payment at $165 per hour for 60 hours is disproportionate to the burden and the expense that Mr. Durlacher actually faces. (Arthrex Memo, Dkt. 2, at p. 9). The court understands that Arthrex is "not unwilling" to pay something more than solely copying costs—costs that Arthrex most certainly must bear.

As the Seventh Circuit has found, "Rules 45(c) and 26(c) of the Federal Rules of Civil Procedure give trial courts considerable discretion in determining whether expense-shifting in discovery production is appropriate in a given case." *Spears v. City of Indianapolis,* 74 F.3d 153, 158 (7th Cir. 1996). Courts have listed a number of factors influencing their decisions whether, and how much, to shift to the issuing party the expenses a subpoenaed party incurs to comply with a subpoena. Those factors include: the breadth of the materials to be produced; whether that breadth looks like a fishing expedition; whether the production necessarily requires expert involvement because of difficult electronic discovery issues or the need for special and

detailed review for privileged information; the relative resources of the party and non-party; whether the non-party is disinterested in the litigation, or has a connection to the issuing party's adversary; whether the non-party could have expected to have been drawn into the litigation or has an interest in the outcome of the case; and the reasonableness of the costs sought. *E.g, Spears,* 74 F.3d at 158; *DeGeer v. Gillis,* 755 F. Supp. 2d 909, 928-29 (N.D. Ill. 2010); *Wells Fargo Bank, N.A. v. Konover,* 259 F.R.D. 206, 207 (D. Conn. 2009); *In re Exxon Valdez,* 142 F.R.D. 380, 383 (D.D.C. 1992) (one of the first cases to address Rule 45(c)'s directive that a court protect a non-party from significant expense in complying with a subpoena).

Some of these factors favor shifting expenses to Arthrex and some point the other way. On balance, the court finds that Mr. Durlacher is not entitled to shift all, or even most, of the costs of compliance to Arthrex. The consulting relationship Mr. Durlacher has with Parcus,[4] his sharing of counsel with Parcus, and the centrality of his role for Parcus in the matters at the heart of this litigation[5] convince the court that significant cost-shifting is not appropriate in this case.

The lack of detail in Mr. Durlacher's affidavit prevents the court (and Arthrex) from understanding how Mr. Durlacher chose 60 hours as a reasonable estimate. There is no suggestion that especially difficult electronic retrieval is involved, that attorney-client privileged information must be culled, or that Mr. Durlacher's files are maintained in some unusual fashion that makes retrieval unusually unwieldy. The court has no information regarding the number of documents Mr. Durlacher believes are responsive to the subpoena, the manner in which his files are organized, or anything else that suggests a 60-hour production effort will be required.

---

[4] That relationship could even support the argument that some of Mr. Durlacher's documents are within the "possession, custody, or control" of Parcus.

[5] As noted above, Parcus has asserted Mr. Durlacher's independent development work as a defense to Arthrex's allegations.

The court also finds that the amount of money Mr. Durlacher typically bills his clients is not the correct proxy for a reasonable fee for his time in complying with a subpoena. Except for testifying experts, courts do not typically order compensation for a person's time to provide testimony that is based on the witness's relative "worth" outside the judicial system. For example, deponents and trial witnesses get the same $40 witness fee and mileage reimbursement be they surgeons or minimum-wage workers. Further, the retrieval of documents unlikely requires the kind of expertise Mr. Durlacher is paid $165 per hour by clients to provide.

After careful consideration, the court has determined that Mr. Durlacher should be reimbursed at a reasonable rate for any time he reasonably expends in excess of 30 hours (but with a ceiling of 30 reimbursable hours) to comply with the subpoena, as the subpoena was limited by Arthrex and addressed in this entry. But to obtain reimbursement, Mr. Durlacher must provide (after complying with the subpoena) a detailed accounting of all the time he spent and a detailed description of the tasks he performed—akin to a lawyer's billing statement to a client. In addition, his description must, at a minimum, describe the manner in which his files were maintained and the nature of the document searches and retrieval process so that the court has a fair understanding of the work involved, why the work required the number of hours expended by Mr. Durlacher, and when the work was performed. Regarding a reasonable hourly rate, the court urges the parties to agree on a reasonable rate but will select one if the parties are unable to agree. Within 14 days of Mr. Durlacher's compliance with the subpoena, Mr. Durlacher shall provide to Arthrex his detailed accounting of the work he performed to comply with the subpoena and request an hourly rate for any work in excess of 30 hours. Within 21 days of Mr. Durlacher's submission to Arthrex, Arthrex shall either pay the amount claimed (excess hours x rate, subject to a ceiling of 30 excess hours) or file a motion with the court demonstrating why

the costs claimed by Mr. Durlacher are excessive and inappropriate.  The court urges the parties to use Arthrex's 21-day period to negotiate in good faith over any disagreement regarding compensation.

### Conclusion

Based on the foregoing analysis, the court GRANTS Arthrex's motion to compel Mr. Durlacher to produce the documents requested by the subpoena, as limited by Arthrex's October 7 letter.  The court DENIES Parcus's and Mr. Durlacher's requests to quash or to further modify the subpoena.  Mr. Durlacher must complete his production within 21 days of the date of this entry.  Arthrex is ordered to pay the copying fees for its copies and to pay a portion of the reasonable expense to Mr. Durlacher to comply with the subpoena, consistent with this order.

So ORDERED.

Dated: 12/21/2011

*Debra McVicker Lynch*
Debra McVicker Lynch
United States Magistrate Judge
Southern District of Indiana

Distribution:

Ryan Frasher
THE FRASHER LAW FIRM, P.C.
rfrasher@frasherlaw.com

Jami A. Gekas
WILDMAN, HARROLD ALLEN & DIXON, LLP
jgekas@edwardswildman.com

Shannon T. Harell
EDWARDS WILDMAN
sharell@edwardswildman.com